USDC SCAN INDEX SHEET















MEG   11/17/99   13:47

3:99-CV-01095   METABOLIFE V. WORNICK

*111*

*O.*

FILED

NOV 1 6 1999

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Metabolife International, Inc., | CIVIL NO. 99-1095-R |
| Plaintiff, | |
| v. | ORDER GRANTING DEFENDANTS' ANTI-SLAPP MOTIONS |
| Susan Wornick, George Blackburn, and Hearst-Argyle Television, Inc., | |
| Defendants. | |

I.   **Overview**

Plaintiff Metabolife International, Inc. ("Metabolife")
claims that, when Defendants made statements as part of a
television news broadcast addressing the safety of Plaintiff's
product, Metabolife 356, they committed defamation, slander, trade
libel, and intentional and negligent interference with prospective
economic advantage.  Responding to these allegations, Defendants
have filed motions (1) to dismiss the complaint under California
Code of Civil Procedure § 425.16 (the "anti-SLAPP statute"), (2)
to dismiss for lack of personal jurisdiction, and (3) to dismiss
for improper venue or, alternatively to transfer venue.  At
Defendants' requests, this order addresses only the motions to

1   dismiss under California's anti-SLAPP statute.   For the reasons

2   set forth herein, the Court grants Defendants' anti-SLAPP motions

3   and strikes Metabolife's complaint in its entirety.

4

5   **II.   Background**

6     Metabolife is a California corporation that manufactures and

7   distributes herbal dietary supplements.   The company's primary

8   product is "Metabolife 356," a dietary supplement designed to

9   promote weight loss and boost energy.   Metabolife 356 is "the best

10  selling dietary supplement for weight loss in the United States."

11  (Compl. ¶8.)   While Metabolife's workforce is based in San Diego,

12  California, Metabolife sells its products through independent

13  distributors which operate retail stands in shopping centers

14  throughout the United States.

15    The primary active ingredient in Metabolife 356 is the

16  Chinese herbal supplement *ma huang*, a naturally-occurring form of

17  the substance ephedrine.   Because the Food and Drug Administration

18  ("FDA") considers *ma huang* to be a food, not a drug, Metabolife

19  can sell its product without undergoing the FDA's rigorous "new

20  drug" approval process.   See 21 U.S.C. § 321 (1999) (defining

21  "food," "drug," and "dietary supplement," which includes "an herb

22  or other botanical"); 21 U.S.C. § 355 (establishing the "new drug"

23  application process).   Nonetheless, concerns about the safety of

24  dietary supplements containing ephedrine have animated recent

25  debates in government.   For example, in 1997, the FDA proposed a

26  rule establishing a dosage regimen and labeling requirements for

27

28

dietary supplements containing ephedrine alkaloids, like *ma huang*.
See 62 Fed. Reg. 30678 (1997); Unites States General Accounting
Office, Dietary Supplements: Uncertainties in Analyses Underlying
the FDA's Proposed Rules on Ephedrine Alkaloids 1 (July 1999)
["Uncertainties"]; see also Massachusetts Dept. Of Public Health,
DPH Issues Advisory on Herbal Dietary Supplements Containing
Ephedra (Aug. 2, 1996).  The FDA's proposed rule responds to over
800 Adverse Event Reports ("AERs") linking ingestion of ephedrine-
based diet pills to serious health effects, including stroke and
death.  See Uncertainties, at 5.  In response to these concerns,
the media has produced numerous broadcasts and articles on the
safety of ephedrine-based diet pills.  See, e.g., Charles Babcock,
Stimulant Propels Diet Empire: Herbal Coalition Fights FDA's
Proposed Safety Regulation, Wash. Post, May 24, 1999, at A1;
Claudie Kalb, Weighing the Health Risks: Do diet pills like
Metabolife work?  And are they safe?, Newsweek, Oct. 18, 1999, at
59.  While no regulations currently exist, the debate rages on.

Metabolife has sued Defendants for their public contributions
to this debate.  Defendant Hearst-Argyle Television, Inc. ("WCVB")
owns numerous television and radio stations across the nation,
including WCVB-TV, a local television station in Boston,
Massachusetts.  From May 11 to May 13, 1999, WCVB broadcast a
three-part news report (the "broadcasts") on the safety of
Plaintiff's product, Metabolife 356.  The broadcasts marked the
culmination of a "five-month investigation" by Defendant Wornick,
a WCVB reporter and presented a negative perspective on the health

risks of Metabolife 356 use.   The broadcasts include narration by
Wornick and footage from several interviews, including one with
Defendant Blackburn, a leading authority in obesity research.

     After the broadcasts aired, Metabolife began a campaign
against the onslaught of negative media attention.  Metabolife
immediately bought a full page ad refuting the broadcasts in the
May 15, 1999 addition of the Saturday Boston Globe. The ad
concludes "We will see Ms. Wornick and WCVB-TV in court."  (Def.
Blackburn's R. Ex. B.)  The company also wrote letters to media
companies designed to deter similar broadcasts on the safety
concerns surrounding Metabolife 356.  (Janis Decl. Exs. 8-10.)
Finally, Metabolife filed the present action, seeking damages
based on numerous statements and alleged defamatory implications
arising from the broadcasts.  The complaint alleges causes of
action for defamation, slander, trade libel, and intentional and
negligent interference with prospective economic advantage.  For
convenience of presentation, the Court lists the alleged
statements and defamatory implications before addressing each in
turn:


Alleged Defamatory Statements

        1.   Defendant Wornick: "Every expert we asked said
        Metabolife is not safe because of its main ingredient, *ma
        huang*."

        2.   Defendant Blackburn: "You can die from taking this
        product."

        3.   Anchor: "Will the legislature here be considering just
        restricting, or banning, Metabolife?"
             *Defendant Wornick: "I think that is what they are going
        to do eventually.  Health officials have told us that they*

1    would like to regulate very tightly how it is sold."

2    4.   Wornick:  "Remember that ad calling Metabolife
     clinically tested for safety?  Metabolife was tested at
3    Vanderbilt University, but only for two weeks and, according
     to their attorney, not for safety.  Vanderbilt officials have
4    ordered Metabolife to stop making that claim."

5    5.   Wornick: "Does this company have any credibility at all,
     doctor?"
6         Blackburn: "None."

7    6.   "The substance ephedrine has long had the attention of
     law enforcement, because it's also the main ingredient in the
8    illegal drug methamphetamine.  On the streets they call it
     meth, or speed."
9
     7.   Wornick: "[Ellis] started a vitamin company that later
10   became Metabolife -- makers of diet pills with ephedrine.
     Again, the same controlled substance found in
11   methamphetamine."

12   8.   Wornick: "[Interviewee] thinks she reacted to ephedrine,
     a powerful heart stimulant that's the main ingredient in the
13   illegal drug methamphetamine, known on the streets as speed."

14
     Defamatory Implications[1]
15
     1.   Implications from statements (1), (2), and (3):
16             (a) Taking Metabolife is deadly;
               (b) The consensus in the medical community is that
17

18   _____

19        [1]  Metabolife supports the existence of these defamatory
     implications with the results of the Marylander Survey, an opinion
20   survey conducted on voluntary participants selected from among
     shopping mall patrons.  Survey participants were shown the
21   broadcasts in their entirety and then were asked to respond to a
     number of questions regarding the content of the broadcasts.
22   First, participants answered an open-ended question asking for a
     description of what they had seen.  (Marylander Decl. ¶ 10.)
23   Second, participants selected from a prepared list the
     propositions that they believed best captured the substance of the
24   broadcasts.  (Marylander Decl. ¶¶ 11-12.)  Based on the Marylander
     Survey, Metabolife presents evidence such as "73% of survey
25   respondents understood [the] broadcasts to say that the main
     ingredient in Metabolife 356 is an illegal, controlled substance."
26   (Metabolife's Mem. In Opp. To Def.'s Ex Parte Appl. to Stay
     Further Discovery at 20.)
27

28                                  -5-

taking Metabolife is deadly; and
        (c) Taking Metabolife as directed poses a risk of death to the average person that is substantially greater than that posed by other over-the-counter legal products.

2.  Implications from statements (4) and (5):
        (d) Metabolife knows that the product it makes and sells to the public is deadly;
        (e) There are no scientific studies concluding that Metabolife 356 is a safe product, and no scientific support for the assertion that Metabolife 356 is a safe product;
        (f) Metabolife misrepresents to the public that scientific studies have concluded that Metabolife 356 is a safe product, and that there is scientific support for the assertion that Metabolife 356 is a safe product;
        (g) Metabolife 356 has not been tested for safety; and
        (h) Metabolife misrepresents to the public that Metabolife 356 has been tested for safety.

3.  Implications from (6), (7), and (8):
        (I) The main ingredient of Metabolife 356 is an illegal controlled substance;
        (j) The main ingredient of Metabolife 356 is identical to the main ingredient in the illegal drug methamphetamine, or "speed"; and
        (k) Metabolife intentionally and deceitfully passes off as a dietary supplement a product that is essentially no different than the illegal drug methamphetamine.

On June 21, 1999, Defendants filed motions to dismiss under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16. Pursuant to that statute, the Court stayed all discovery upon notice of the motion to dismiss.  By order dated September 24, 1999, the Court ordered limited discovery to enable Metabolife to meet its burden of opposing Defendants' motions, but later stayed all discovery pending the present order.  As explained below, the Court does not address issues for which Metabolife should be granted discovery prior to a decision.

-6-

III. Discussion

Defendants have moved to dismiss Plaintiff's claims pursuant to California's anti-SLAPP statute.[2]  "SLAPP" stands for "strategic lawsuit against public participation," and the statute provides a mechanism for a defendant to strike civil actions brought primarily to chill the exercise of free speech.  See Cal. Civ. Proc. Code § 425.16(b)(1).  The California Legislature passed the statute recognizing "the public interest to encourage continued participation in matters of public significance . . . and [finding] that this participation should not be chilled through abuse of the judicial process."  5 Witkin, California Procedure, § 962, at 422 (4th ed. 1997).

A defendant in a civil action may move under the anti-SLAPP statute to strike any cause of action based on his "act in furtherance of [the] right to petition or free speech."  See Cal. Civ. Proc. Code § 425.16(b).  An "act in furtherance" includes "any . . . oral statement . . . made in a . . . public forum in connection with an issue of public interest."  Cal. Civ. Pro. Code § 425.16(e); Lafayette Morehouse, Inc. v. Chronicle Publ'g Co., 37 Cal. App. 4th 855, 862 (1995) (allowing motion by media defendants).  Each of Metabolife's causes of action is based on statements published by Defendants as part of a widely disseminated television broadcast, which is undoubtedly a public

---

[2]  The Court applies California law to interpret the anti-SLAPP statute, which, although state law, supports a motion to dismiss in federal diversity actions.  See United States v. Lockheed Missiles & Space Co., Inc., 190 F.3d 963, 972-73 (9th Cir. 1999).

1    forum.   Metabolife rightly concedes that "the safety of products

2    intended for human consumption is a matter of public concern."

3    (Metabolife's R. to Courts Order on Preparation for Sept. 8

4    Hearing at 11.)   Therefore, Defendant's anti-SLAPP motions apply

5    to every cause of action that Metabolife asserts.

6       To ensure that participation in public debate is not

7    "chilled," the anti-SLAPP statute establishes a procedure for

8    early dismissal of meritless lawsuits against public speech.   Once

9    the defendant establishes prima facie that the statute applies,

10    the plaintiff must show a "reasonable probability" of prevailing

11    on its claim.   See Wilcox v. Superior Court, 27 Cal. App. 4th 809,

12    824-25 (1994); Cal. Civ. Proc. Code § 425.16(b).   Plaintiff must

13    demonstrate that "the complaint is legally sufficient and

14    supported by a prima facie showing of facts to sustain a favorable

15    judgment if the evidence submitted by the plaintiff is credited."

16    See Wilcox, 27 Cal. App. 4th at 823.   This burden is "much like

17    that used to determine a motion for nonsuit or directed verdict,"

18    which mandates dismissal when "no reasonable jury" could find for

19    the plaintiff.   See id. at 824 (citing Rowe v. Superior Court, 15

20    Cal. App. 4th 1711, 1723 (1993)); see also Fed. R. Civ. P. 50(b)

21    (permitting post-verdict judgment as a matter of law against a

22    party when there is no basis for a "reasonable jury" to find for

23    that party).   The defendant's anti-SLAPP motion should be granted,

24    therefore, when the plaintiff presents an insufficient legal basis

25    for the claims or "when no evidence of sufficient substantiality

26    exists to support a judgment for the plaintiff."   Wilcox, 27 Cal.

27

28                                        -8-

1 | App. 4th at 828 (citing Carson v. Facilities Dev. Co., 36 Cal. 3d

2 | 830, 838-39 (1984)).

3 | In opposing dismissal under the anti-SLAPP statute, Plaintiff

4 | must establish its prima facie case with competent and admissible

5 | evidence. See id. at 830; Macias v. Hartwell, 55 Cal. App. 4th

6 | 669, 675 (1997); Evans v. Unkow, 38 Cal. App. 4th 1490, 1497

7 | (1995). Plaintiff "cannot simply rely on the allegations in the

8 | pleadings . . . to make the evidentiary showing," but must present

9 | independent evidence to establish its prima facie case in tort.

10 | See Church of Scientology of Cal. v. Wollersheim, 42 Cal. App. 4th

11 | 628, 656 (1996). In this case, because the speech that forms the

12 | basis for Metabolife's action concededly addresses a matter of

13 | "public concern," Metabolife must prove that statements were false

14 | and uttered with "actual malice." See Milkovich v. Lorain Journal

15 | Co., 497 U.S. 1, 14 (1990); Philadelphia Newspapers Inc. v. Hepp,

16 | 475 U.S. 767, 776 (1986) (finding that the "Constitution

17 | require[s] us to tip the balance in favor of protecting true

18 | speech" in order to "ensure that true speech on matters of public

19 | concern is not deterred"). Thus, provided that Metabolife has

20 | been granted adequate discovery, the anti-SLAPP statute requires

21 | Metabolife to establish a prima facie case of falsity and actual

22 | malice to avoid dismissal.

23 | Because the Court has stayed all discovery, it will not

24 | consider Metabolife's prima facie evidence of actual malice at

25 | this early stage in the litigation. To satisfy due process, the

26 | plaintiff's burden must be compatible with the early stage of the

27 |

28 | -9-

1   action and the limited discovery opportunities.   See Cal. Civ.

2   Proc. Code § 425.16(f), (g).   In federal court, "if a defendant

3   desires to make a special motion to strike based on the

4   plaintiff's lack of evidence, the defendant may not do so until

5   discovery has been developed sufficiently to permit summary

6   judgment under Rule 56."   See Rogers v. Home Shopping Network,

7   Inc., No. 98-6326, 1999 WL 528154, at *10 (C.D. Cal. July 22,

8   1999) (citing United States v. Lockheed Missiles & Space Co., 171

9   F.3d 1208 (9th Cir. 1999)).   Summary judgment is often considered

10  inappropriate early in the case, for example, when the moving

11  party controls the information required to oppose the motion.   See

12  Rogers, 1999 WL 52815, at *8.   In that situation, courts "are

13  lenient in granting further time for discovery."   See id. (quoting

14  Wright, et al., Federal Practice & Procedure § 2740 (2d ed.

15  1996)).   Thus, the Court should not scrutinize Plaintiff's

16  evidence of facts uniquely within the Defendants' control before

17  ordering discovery to enable Plaintiff to meet its burden of

18  opposing Defendants' anti-SLAPP motions.   Evidence of "actual

19  malice," which exists when the speaker "entertained serious doubts

20  as to the truth of his statement," see Newton v. National Broad.

21  Co., 930 F.2d 662, 668 (9th Cir. 1991) (en banc) (citing Bose

22  Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 n.30

23  (1984)), is uniquely within the control of Defendants and,

24  therefore, generally should not be tested at this early stage of

25  the litigation, see Rogers, 1999 WL 528154, at *9.

26      Because the Court has stayed all discovery, this order does

27

28                              -10-

1  not weigh Metabolife's evidence to determine whether it has

2  established a prima facie case of actual malice.  Rather, the

3  discussion that follows addresses the legal defenses of Defendants

4  and whether Metabolife has established a prima facie case of

5  falsity.[3]  The Court considers each statement and alleged

6  implication in turn.

7

8       A.   "You can die from taking this product."

9       Metabolife asserts all causes of action against all

10 Defendants on the basis of Defendant Blackburn's televised

11 statement, made during an interview with Susan Wornick, that "you

12 can die" from taking Metabolife 356.  The Court grants Defendants'

13 anti-SLAPP motions as to this statement for two reasons: (1)

14 Metabolife has not provided admissible prima facie evidence that

15 this statement is false, and (2) Defendant Blackburn's statement

16 is entitled to First Amendment protection as a "rational

17 interpretation" of a conflicting and ambiguous source.

18

19

20

21

22 _____

23      [3] Unless otherwise indicated, the Court's analysis of each
   statement and alleged implication applies to all causes of action
24 alleged by Metabolife.  Metabolife is required to prove falsity in
   support of each cause of action either because it is an element of
25 the plaintiff's proof in a "public concern" case (defamation,
   slander, and trade libel claims), or because the cause of action,
26 as plead, requires that the Court first find defamation
27 (interference with prospective economic advantage).

28                              -11-

1

## 1.  Metabolife's Evidence of Falsity is Inadmissible Under Daubert[4]

To prove falsity, Metabolife submits numerous declarations by scientific experts which purport to establish that, when taken as directed, Metabolife 356 poses no more than minor health risks. The Court holds that Metabolife's evidence is inadmissible under Fed. R. Evid. 702, and Metabolife, therefore, does not meet its burden of proving a prima facie case of falsity.  Accordingly, the Court grants Defendants' anti-SLAPP motions and strikes Metabolife's claim based on Dr. Blackburn's commentary.[5]

Metabolife must meet its burden of proving prima facie

_____

[4]   The Court notes, initially, that the parties disagree about the precise meaning of the simple phrase uttered by Defendant Blackburn.  Metabolife asserts that, when Dr. Blackburn said "you can die," he conveyed to listeners the message "you can die from taking Metabolife as directed."  Thus, Metabolife claims that it must prove the falsity only of that message as conveyed to listeners.  Defendants resist Metabolife's addition of the phrase "as directed," and seek to have Metabolife disprove the less controversial proposition that Metabolife 356 can kill when abused.  The Court neglects to choose between the parties interpretations of Defendant Blackburn's statement because it holds that, even if the Court adds Metabolife's phrase "as directed," Metabolife has not provided any admissible prima facie evidence of falsity.

[5]   The Court's ruling also disposes of the alleged implications from Dr. Blackburn's statement.  Because the Court finds that Metabolife's scientific evidence of the safety is inadmissible, Metabolife cannot prove the falsity of the alleged implications "taking Metabolife is deadly," "the consensus in the medical community is that taking Metabolife is deadly," and "taking Metabolife as directed poses a risk of death to the average person that is substantially greater than that posed by other over-the-counter legal products."

-12-

1  falsity with admissible evidence.   See Wilcox v. Superior Court,

2  27 Cal. App. 4th 809, 830 (1994); Evans v. Unkow, 38 Cal. App. 4th

3  1490, 1497 (1995).   In federal court, that burden requires

4  presentation of scientific evidence that is admissible under

5  Federal Rule of Evidence 702.[6]  Rule 702 provides that "[i]f

6  scientific, technical, or other specialized knowledge will assist

7  the trier of fact to understand the evidence or to determine a

8  fact in issue, a witness qualified as an expert by knowledge,

9  skill, experience, training, or education, may testify thereto in

10  the form of an opinion or otherwise."  Fed. R. Evid. 702 (1999).

11       The Supreme Court has determined the standard under Rule 702

12  for admitting expert scientific testimony in federal courts.   In

13  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993),

14  the Court held that the Federal Rules of Evidence displaced the

15

16       [6]  Metabolife insists that the Court must accept its
scientific evidence as true because, under the anti-SLAPP statute,

17  the Court cannot "weigh the evidence or determine questions of
credibility, but accept[s] all evidence favorable to the plaintiff

18  as true."  See Wilcox, 27 Cal. App. 4th at 828.   The Court
disagrees.   Metabolife must meet its burden of proving prima facie

19  falsity with admissible evidence.  See Wilcox v. Superior Court,
27 Cal. App. 4th 809, 830 (1994); Evans v. Unkow, 38 Cal. App. 4th

20  1490, 1497 (1995).   In federal court, that means that Metabolife
must produce scientific evidence that is admissible under Rule

21  702.   Scrutinizing Metabolife's scientific evidence at this early
stage is consistent with Ninth Circuit case law applying Rule 702

22  to exclude scientific evidence at the pretrial motion stage.   See,
e.g., Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 595

23  (9th Cir. 1996); Claar v. Burlington Northern Railroad Co., 29

24  F.3d 499, 500 (9th Cir. 1994).  Moreover, ruling early on
Metabolife's scientific evidence promotes the purpose of the

25  Federal Rules of Evidence to "eliminat[e] unjustified expense and

26  delay," see Fed. R. Evid. 102 (1999), since it wastes time and
resources to proceed on a claim based on evidence that would never

27  be admissible at trial.

28                                   -13-

1 | traditional "general acceptance" test of Frye v. United States
2 | because the rigid general acceptance test was at odds with the
3 | "liberal thrust" of the Federal Rules.  Id. at 587-89.

4 |     Under Daubert, the district court plays the role of
5 | "gatekeeper" by undertaking the daunting task of weeding out "bad
6 | science" that is unworthy of admission into evidence in a federal
7 | court.[7]  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d
8 | 1311, 1316 (9th Cir. 1995) ("Daubert II").  To do this, the Court
9 | must make a preliminary determination that the proffered expert
10 | scientific testimony is both relevant and reliable.  Daubert, 509
11 | U.S. at 589-92.  Scientific evidence is reliable if it is based on
12 | an assertion that is grounded in methods of science.  The focus is
13 | solely on the principles and methodology, not on the conclusion.
14 | Id. at 595-94.

15 |     The Daubert Court set out a nonexclusive list of "general
16 | observations" to aid the federal trial judge in making the
17 | preliminary determination of relevancy and reliability: (1)
18 | whether the scientific theory or technique can be (and has been)
19 | tested; (2) whether the theory or technique has been subjected to
20 | peer review and publication; (3) whether a particular technique
21 | has a known potential rate of error; and (4) whether the theory or

---

23 |     [7]  The district court exercises its discretion to determine
24 | the admissibility of scientific evidence.  See United States v.
    Cordoba, 1999 Daily Journal D.A.R. 11478 (Nov. 15, 1999) ("'[I]t
25 | is very much a matter of discretion with the [trial] court whether
    to receive or exclude the evidence' and appellate courts should
26 | 'not reverse in such a case unless the ruling is manifestly
    erroneous.'") (quoting General Electric Co. V. Joiner, 118 S. Ct.
27 | 512, 517 (1997)).

1   technique is generally accepted in the relevant scientific

2   community.  Id. at 593-94.

3       On remand, the Ninth Circuit held that a "very significant

4   factor to be considered is whether the experts are proposing to

5   testify about matters growing naturally and directly out of

6   research they have conducted independent of the litigation, or

7   whether they have developed their opinion expressly for purposes

8   of testifying."  Daubert II, 43 F.3d at 1317.  An expert who

9   testifies about research that the expert herself conducted

10  independent of litigation provides "important, objective proof

11  that the research comports with the dictates of good science."

12  Id.

13      Metabolife's scientific evidence is inadmissible under

14  Daubert because it lacks sufficient indicia of reliability.

15  Metabolife's evidence of falsity consists of numerous declarations

16  that rely on the following scientific bases: (1) Metabolife 356

17  animal toxicity studies conducted by Shanghai Medical University

18  and National Taiwan University (the "Chinese animal studies"), (2)

19  an unpublished, incomplete cardiovascular risk study undertaken at

20  the Columbia Medical Center (the "Columbia Study"), (3) short-term

21  efficacy studies by Vanderbilt University Medical Center and St.

22  Luke's Roosevelt Hospital Center (the "efficacy studies"), and (4)

23  numerous published scientific articles addressing issues related

24  to the safety of ephedrine.

25      Before addressing the reliability of the particular bases for

26  the expert opinions in this case, the Court notes that, with one

27

28                              -15-

1    exception,[8] the opinions expressed in Metabolife's expert

2    declarations were formed for purposes of this litigation rather

3    than "growing naturally and directly out of research [the experts]

4    have conducted independent of the litigation."[9] See Daubert II,

5    43 F.3d at 1317.  Because Metabolife's experts formulated their

6    opinions for purposes of this litigation, the Court must

7    scrutinize closely the stated bases for those opinions:

8         [i]f the proffered expert testimony is not based on
          independent research, the party proffering it must come
9         forward with other objective, verifiable evidence that
          the testimony is based on "scientifically valid
10        principles."  One means of showing this is by proof that
          the research and analysis supporting the proffered
11        conclusions have been subjected to normal scientific
          scrutiny through peer review and publication.
12
     Id. at 1318.
13
     The Court holds that the bases for Metabolife's expert opinions
14
     are unreliable and render the opinions inadmissible under Daubert.
15
          First, the Court follows numerous other decisions by holding
16
     that Chinese animal studies are inadmissible due to the
17
     uncertainties in extrapolating from effects on mice and rats to
18
     _____

19        [8]  The exception is Dr. Ruth Strauss, a researcher for the
     Columbia Study, who submits a declaration, based on her own
20   research, stating that Metabolife 356 does not create "any
     significant risk of adverse cardiac event in otherwise healthy
21   obese people."  (Strauss Decl. ¶18.)  While Dr. Strauss' opinion
     may have been formed independently of this litigation, the
22   Columbia Study on which it relies suffers from other indices of
     unreliability discussed herein.
23

24        [9]  In this regard, the Court feels like Judge Kozinski in
     Daubert II, 43 F.3d at 1318, who wrote: "None of the plaintiff's
25   experts has published his work . . . in a scientific journal or
     solicited formal review by his colleagues. . . .  It's as if there
26   were a tacit understanding . . . that what's going on here is not
     science at all, but litigation."
27

28                              -16-

1  humans.  See, e.g., Turpin v. Merrell Dow Pharm., Inc., 959 F.2d

2  1349, 1359 (6th Cir. 1992), cited with approval in Daubert, 509

3  U.S. at 596; In re "Agent Orange" Liability Litigation, 611 F.

4  Supp. 1223, 1241 (E.D.N.Y. 1985); Lynch v. Merrell-National

5  Laboratories, Division of Richardson-Merrell, Inc., 830 F.2d 1190,

6  1194 (1st Cir. 1987).  The Chinese animal studies are short-term,

7  high-toxicity studies of effects on animals that took place

8  outside the United States government's regulatory supervision.

9  First, the nature of the Chinese animal studies requires

10  extrapolation from animals to humans, from high doses to low

11  doses, and from short to long-term exposures.  Difficulties in

12  such extrapolation has lead to controversy concerning the

13  admissibility of such studies.  See Bernard Goldstein & Mary Sue

14  Henifen, Reference Guide on Toxicology, in Federal Judicial Center

15  Reference Manual on Scientific Evidence 182, 193 (1994).  Further,

16  because the research took place outside the United States and was

17  not part of the FDA drug application process, it is not governed

18  by federal codes setting the standards for good laboratory

19  practice.  See id. at 192-93 (noting the existence of government

20  oversight for animal toxicity studies, including FDA good

21  laboratory practice standards).[10]  Finally, Metabolife

22  commissioned the Chinese animal studies itself and the research

---

[10]  Significantly, animal studies alone cannot justify FDA
approval of a new drug, but only serve as a necessary first step
to obtaining FDA permission to test in humans.  See Jeffrey P.
Cohn, U.S. Food and Drug Administration, The Beginnings:
Laboratory and Animal Studies (visited Oct. 14, 1999)
<www.fda.gov/fdac/special/newdrug/begin.htm>.

1   results have not been through the peer review and publication

2   process.   In short, the Chinese animal studies possess none of the

3   indicia of reliability necessary for admissibility under Daubert.

4   The Columbia Study is similarly unreliable.   The study was

5   commissioned by Metabolife and is not finished.   While Metabolife

6   contends that Dr. Strauss' portion of the Columbia Study, which

7   she cites to support her expert opinion, has been carried through

8   to completion, there is no evidence that any research results have

9   been subject to peer review.   On the contrary, Metabolife has

10   successfully petitioned the Court to issue a protective order

11   maintaining the secrecy of Dr. Strauss' research results.

12   (Court's Order Permitting Filing Under Seal, filed Sept. 1, 1999.)

13   Aside from its unreliability, the Columbia Study is also of

14   questionable relevancy to the falsity of the statement "you can

15   die from taking Metabolife."   Metabolife's experts have consulted

16   a "draft" article by the Columbia Study team on the efficacy of ma

17   huang as a weight loss supplement, but this short-term study can

18   have little relevance to the safety of the substance.   Moreover,

19   Dr. Strauss' portion of the Columbia Study dealt only with

20   particular cardiovascular effects.   Because there are more ways to

21   die than through "significant adverse cardiovascular events," Dr.

22   Strauss' opinion and study, even if reliable, would be of limited

23   relevance to the falsity of Dr. Blackburn's statement.   Due to the

24   minimal reliability and relevance of the Columbia Study, the Court

25   finds that its results are inadmissible under Daubert.

26   Similarly, the short-term efficacy studies submitted by

27

28   -18-

1  Metabolife are incapable of supporting the falsity of the
2  statement "you can die from taking Metabolife."  The only
3  statement for which efficacy studies could possibly provide
4  reliable and relevant evidence of falsity is "you cannot lose
5  weight by taking Metabolife."  Nonetheless, Metabolife seeks to
6  employ its efficacy studies to demonstrate the safety of its
7  product by pointing out that, over the course of the short-term
8  studies, no test subjects suffered from detected adverse health
9  effects.  This is not reliable research methodology for testing
10 the safety of a supplement intended for long-term use.  Safety
11 testing is not even the purpose of the study's research design.
12 The Court therefore finds that the efficacy studies are
13 inadmissible under Daubert for establishing the falsity of the Dr.
14 Blackburn's statements.

15      Metabolife's experts also base their opinions on published
16 scientific articles addressing issues related to the safety of
17 ephedrine.  While some of these articles are published and peer-
18 reviewed, they are inadmissible as relied upon by Metabolife's
19 experts.  Because Metabolife relies on expert opinions formulated
20 specifically for trial, its experts must "explain precisely how
21 they went about reaching their conclusions and point to some
22 objective source . . . to show that they have followed the
23 scientific method."  See Daubert II, 43 F.3d at 1319.
24 Metabolife's experts do not explain precisely how they use the
25 scientific literature to support their opinion.  Rather, the
26 experts list numerous articles in scientific journals and simply
27
28                              -19-

1  state that, after reviewing these articles, they are convinced

2  that Metabolife 356 cannot cause serious health problems.

3       Despite the assurances of Metabolife's experts, a review of

4  the listed scientific literature raises applicability questions

5  that the experts do not address.  For example, the list includes

6  articles titled "Ephedrine as an Anoretic," "Ephedrine Therapy In

7  Asthmatic Children," and "Contribution of Bat and Skeletal Muscle

8  to Thermogenesis Induced by Ephedrine in Man."[11]  The missing

9  explanation as to how articles such as these support the opinions

10  of Metabolife's experts renders those opinions inadmissible under

11  Daubert.[12]

12

13

14

15  _____

16       [11]  The one source that Metabolife repeatedly touts as
    substantial evidence of safety--Dennis Jones, Safety of Ephedra
17  Herbs: A Preliminary Report, File: HSE25JN5 1 (1995) ("Jones
    article")--is by its own title, a "preliminary" result.  Moreover,
18  far from being published and peer reviewed, the Jones article is
    stamped "CONFIDENTIAL," which implies that it is not open for
19  review and comment in the scientific community.  Thus, while the
    applicability of this report is subject to less doubt than much of
20  Metabolife's scientific literature, the Court finds that the Jones
    article lacks sufficient indicia of reliability to be admissible
21  under Daubert.

22       [12]  Metabolife's submissions with regard to the scientific
23  literature are very similar to those held inadmissible in Daubert
    II: "[P]laintiff's experts have relied on animal studies, chemical
24  structure analyses, and epidemiological data, [but] they neither
    explain the methodology . . . followed to reach their conclusions
25  nor point to any external source to validate that methodology.
    We've been presented with only the experts' qualifications, their
26  conclusions and their assurances of reliability.  Under Daubert
27  that's not enough."  Daubert II, 43 F.3d at 1319.

1

## 2.  Dr. Blackburn's Statement is Protected
## First Amendment Speech

2

3      Even if Metabolife had proved its prima facie case of

falsity, the Court would still dismiss its claim because, in the

4

context of the current debate surrounding the safety of ephedrine-

5

based diet pills, Dr. Blackburn's statement that "you can die"

6

from taking Metabolife 356 constitutes unactionable First

7

Amendment speech.  The Court holds that Dr. Blackburn's statement

8

is protected as a "rational interpretation" of the ambiguous and

9

unresolved state of scientific knowledge regarding the safety of

10

products like Metabolife.

11

A line of Supreme Court cases establishes special protection

12

for First Amendment speech that is a "rational interpretation" of

13

an ambiguous source.  See Bose Corp. v. Consumers Union of U.S.,

14

Inc., 466 U.S. 485 (1984); Time, Inc. v. Pape, 401 U.S. 279

15

(1971).  Confronting the difficulties to public commentators of

16

offering original interpretation of ambiguous sources, the Court

17

held, in those cases, that the defendant "did not publish a

18

falsification sufficient to sustain a finding of actual malice."

19

See Masson v. New Yorker Magazine, Inc., 501 U.S 496, 519 (1991).

20

"The protection for rational interpretation serves First Amendment

21

principles by allowing an author the interpretive license that is

22

necessary when relying on an ambiguous source."   Id.

23

The Bose case is particularly useful in the present analysis

24

because it involved critical statements about Plaintiff's product,

25

a stereo speaker system.  The defendant in Bose published an

26

article in its magazine stating that the sound from the Bose

27

28                                  -21-

1  speaker system tended to "wander around the room." See Bose, 466

2  U.S. at 488.   In a bench trial, the district court held that the

3  statement was false because, in fact, the reporter had heard sound

4  wandering only between the speakers and along the wall, not around

5  the entire room.  See id. at 490.  On that basis, the district

6  court entered judgment against the defendant.  The court of

7  appeals reversed and the Supreme Court affirmed that reversal,

8  stating that adoption of the "around the room" language was "'one

9  of a number of possible rational interpretations' of an event

10 'that bristled with ambiguities'."  See id. at 512 (quoting Pape,

11 401 U.S. at 290).  Thus, though the statement "reflect[ed] a

12 misconception, [this] does not place the speech beyond the outer

13 limits of the First Amendment's broad protective umbrella."  Id.

14 Rather, "erroneous statement is inevitable in free debate, and . .

15 . must be protected if the freedoms of expression are to have the

16 'breathing space' that they 'need . . . to survive.'"  Id.

17 (quoting New York Times v. Sullivan, 376 U.S. 254, 271-72 (1964)).

18      Given the controversy surrounding the safety of Metabolife

19 356, Defendant Blackburn's statement is incapable of supporting a

20 finding of actual malice.[13]  Dr. Blackburn's statement presents an

21 even stronger case for protection than in Bose because, unlike in

22

23  _____

24      [13]   The Court stresses that, because it has stayed all
    discovery, it does not rule on the basis that Metabolife has not
25  proven a prima facie case of actual malice.  Rather, the Court
    holds as a matter of law that, given the controversy surrounding
26  the safety of ephedrine-based diet pills, the character of Dr.
    Blackburn's statement--namely, public comment on the scientific
27  controversy--is non-actionable First Amendment speech.

28                                -22-

1   <u>Bose</u>, the source of the statement is so complex and "ambiguous"

2   that this Court cannot find that the statement is false.  Rather,

3   the Court has previously found that Metabolife's evidence of

4   falsity is inadmissible because it is scientifically unreliable.

5   Moreover, while controversy surrounds the interpretation of the

6   FDA's Adverse Event Reports, Defendant Blackburn could easily

7   support his statement with the reported deaths that motivated the

8   FDA's proposed rule.  <u>See</u> 62 Fed. Reg. 30678 (1997).  Given the

9   controversial and ambiguous nature of Defendant Blackburn's source

10  material, the Court holds that he "did not publish a falsification

11  sufficient to sustain a finding of actual malice."[14]  <u>See</u> <u>Masson</u>,

12  501 U.S at 519.

13      Dr. Blackburn's statements are protected by the First

14  Amendment as a "rational interpretation" of the complex and

15  unresolved scientific debate concerning the safety of ephedrine-

16

17

18  _____

19      [14]  Metabolife's evidence of Dr. Blackburn's affiliation with
    competing companies is irrelevant to the actual malice
20  determination.  "Actual malice" turns exclusively on the extent of
    Defendant's knowledge regarding the truth of the statements
21  uttered.  It cannot be supported by evidence of hostility or
    "intention to harm."  <u>See</u> <u>Greenbelt Cooperative Publ'g Ass'n v.</u>
22  <u>Bresler</u>, 398 U.S. 6, 10-11 (1970); <u>Beckley Newspapers Corp. V.</u>
    <u>Hanks</u>, 389 U.S. 81, 82 (1967); <u>see also</u> <u>Harte-Hanks</u>
23  <u>Communications, Inc. v. Connaughton</u>, 491 U.S. 657, 664-65 (1989)
    (holding that newspaper's motive to increase profits cannot
24  support a finding of actual malice).  Thus, Metabolife's bias
    evidence does not affect the Court holding that, given the
25  ambiguous state of knowledge concerning the safety of ephedrine-
    based diet pills, Dr. Blackburn's statement is incapable of
26  supporting a finding of actual malice.

27

1   based diet pills like Metabolife 356.[15]  Because the safety of

2   Metabolife 356 remains an open question of substantial public

3   importance, contributions to the debate are protected by the First

4   Amendment.  If a consensus is ultimately reached that the product

5   is safe, Metabolife may have been an unintended victim of the

6   Constitution's ardent free speech protections.  We risk such

7   results in order to foster a public forum for the robust debate

8   that identifies scientific truths.  In the words of Judge

9   Easterbrook, scientific controversies "must be settled by the

10  methods of science rather than by the methods of litigation.  More

11  papers, more discussion, better data, and more satisfactory

12  models--not larger awards of damages--mark the path toward

13  superior understanding of the world around us."  Underwager v.

14  Salter, 22 F.3d 730, 736 (7th Cir. 1994).

15

16       B.  "Every expert we asked said Metabolife is not safe
          because of its main ingredient, Ma Huang."
17
         Metabolife seeks to impose liability on Defendants Wornick
18
    and WCVB on the basis of Wornick's "every expert" statement and
19

20  _____

21       [15]  The Court recognizes the novelty its application of the
    "rational interpretation" standard to public scientific comment.
22  Nonetheless, particularly in the context of scientific
    contribution to public health debates, the Court believes itself
23  justified in applying the doctrine in this context.  If the First
    Amendment provides heightened protection for rational comment on
24  stereo speakers, it should also protect scientific comment on
    issues as important as public health.  See Michael Kent Curtis,
25  Monkey Trials: Science, Defamation, and the Suppression of
    Dissent, 4 Wm. & Mary Bill Rts. J. 507, 582 (1995) (arguing for a
26  application of the "rational interpretation" doctrine to
    scientific comment against public figures).
27

28                              -24-

1   the alleged implication therefrom that "the consensus in the

2   medical community is that taking Metabolife is deadly."  The Court

3   strikes Metabolife's claims on these basis because (1) Metabolife

4   cannot prove the falsity of the alleged defamatory statement, and

5   (2) the statement is not capable of supporting the implication

6   that Metabolife ascribes to it.

7        Wornick's statement derives its allegedly defamatory nature

8   from the portion which calls Metabolife 356 "not safe," not the

9   portion which notes that "every expert" reached this conclusion.[16]

10  As the Court discusses above, Metabolife cannot prove a prima

11  facie case of the falsity of that defamatory portion because it

12  offers only inadmissible scientific evidence of safety.  Thus, the

13  Court strikes Metabolife's claims based on the "every expert"

14  statement under the anti-SLAPP statute.

15       Metabolife also cannot proceed on the basis of the alleged

16  defamatory implication.  The Court should not imply defamatory

17  meaning to a defendant's statements unless the words uttered are

18  "reasonably capable of sustaining" the implication.  See Dodds v.

19  American Broad. Co., 145 F.3d 1053, 1063 (9th Cir.), cert. denied,

20  119 S. Ct. 866 (1998); Eastwood v. National Enquirer, Inc., 123

21  F.3d 1249, 1256 (9th Cir. 1997).  The Court makes this

22  determination by examining the statements themselves, in context

23  of the entire broadcast.  See Auvil v. CBS 60 Minutes, 67 F.3d

24  816, 822 (9th Cir. 1995); Underwager v. Channel 9 Australia, 69

25  _____

26       [16]  For example, Metabolife would clearly have no claim if
    Wornick had stated that "every expert declined to comment on the
27  safety of Metabolife 356."

28                              -25-

F.3d 361, 366 (9th Cir. 1995) (finding that the court examines the "totality of the circumstances" in determining whether a statement implies a factual assertion). "It is the statements themselves that are of primary concern in the analysis." Auvil, 67 F.3d at 822. "Defamatory meaning may not be imputed to true statements. The defamatory character of the language must be apparent from the words themselves." Id.; see also Izuzu Motors Ltd. v. Consumers Union of U.S., Inc., 12 F. Supp. 2d 1035, 1045 (C.D. Cal. 1998) (finding that the court must "refrain from scrutinizing what is not said to find a 'defamatory meaning which the article does not convey to a lay reader'") (quoting Church of Scientology of California v. Flynn, 744 F.2d 694, 696 (9th Cir. 1984)).

Here, Wornick's statement does not imply a "consensus" in the scientific community, as Metabolife asserts. The statement is explicitly limited to the experts consulted by Defendants Wornick and WCVB. It would be unreasonable to believe that Defendants consulted the entire scientific community before making the statement. Yet, such an inference is logically necessary to finding the implication urged by Metabolife. The Court finds, therefore, that Wornick's "every expert" statement is not capable of supporting the alleged implication asserted by Metabolife.[17]

---

[17]   The Court does not believe, as Metabolife insists, that the Marylander Survey compels Metabolife's defamatory implications. First, the Court determines whether a statement carries an alleged implication as a threshold question of law; only if the Court answers this question yes does the jury then address whether the statement was so understood by the audience. See Izuzu Motors, 12 F. Supp. 2d at 1045; Restatement (Second) of Torts § 614 (1977). While the Marylander Survey may be useful to

1    The Court strikes Metabolife's claim based on this alleged

2    implication.

3

4        C.  Statements about "just restricting, or banning,
         Metabolife?"
5

6    Metabolife seeks to hold Defendants Wornick and WCVB liable

     for Wornick's prediction regarding what steps, if any, government
7
     regulators would take regarding sales of Metabolife 356.   The
8
     Court strikes Metabolife's claim based on these statements under
9
     the anti-SLAPP statute because the statements are non-actionable
10
     opinion.
11
     Because defamation requires false statements of fact, mere
12
     opinions are not actionable.  See  Standing Comm. on Discipline v.
13
     Yagman, 55 F.3d 1430, 1439 (9th Cir. 1995) (holding that an
14
     attorney's comments questioning the integrity of a judge were not
15
     actionable in a disciplinary proceeding as they were expressions
16
     of opinion based on stated facts); Rizzuto v. Nexxus Products Co.,
17
     641 F. Supp. 473, 481 (S.D.N.Y.) (holding that statements of
18

19   ─────────────────────

     the jury in its role, it does not assist the Court in making the
20   threshold determination of law, for which the Court relies
     primarily on the statements themselves.  See Auvil, 67 F.3d at
21   822.  Second, even if the Marylander Survey factored into the
     Court's decision, it would be of negligible value.  The only
22   evidence that viewers discerned the implications alleged by
     Metabolife is participants selection from a list of propositions
23   proposed by Metabolife.  The list of propositions was leading and
     overly suggestive, as it contained only two types of statements to
24   select among: (1) positive or neutral statements clearly
     unsubstantiated by the broadcasts (e.g., "Metabolife has been
25   evaluated an approved by the FDA"), or (2) the negative
     "implications" that Metabolife asserts as the basis for this
26   lawsuit.

27

28                                -27-

1   opinion were not actionable in trade libel case), aff'd, 810 F.2d

2   1161 (2d Cir. 1986); cf. Milkovich v. Lorain Journal Co., 497 U.S.

3   1, 19 (1990) (holding that statements of opinion are protected by

4   the First Amendment in a defamation action unless they "imply a

5   false assertion of fact").  An opinion is a statement that is not

6   "provable as false": "[A] statement of opinion relating to matters

7   of public concern which does not contain a provably false factual

8   connotation will receive full constitutional protection."  See

9   Milkovich, 497 U.S. 1, 20 (1990) (citing Philadelphia Newspapers,

10  Inc. v. Hepps, 475 U.S. 767 (1986)).

11      Defendant Wornick's statement is a prediction of uncertain

12  future actions by government regulators.  By definition, such a

13  statement is not "provable as false" when uttered because the

14  future has not happened yet.  When Wornick made the statement, it

15  was impossible to determine what form of regulation, if any, would

16  govern sales of Metabolife 356.  Thus, Wornick's statement was not

17  "provable as false" when made, and cannot constitutionally serve

18  as the basis for liability.

19      Metabolife attempts to render Wornick's statement actionable

20  by asserting certain factual implications regarding the health

21  risks of taking Metabolife that purportedly arise from the

22  broadcast of the statement in context.[18]  The Court rejects

23

24      [18]  Metabolife claims that the following implications arise
    from Wornick's statement, in the context of the broadcasts as a
25  whole: (1) taking Metabolife is deadly; (2) the consensus in the
    medical community is that taking Metabolife is deadly; and (3)
26  taking Metabolife as directed poses a risk of death to the average
    person that is substantially greater than that posed by other
27

28                                  -28-

1   Metabolife's attempts to generate liability through alleged

2   implications from Wornick's literal statement for two reasons: (1)

3   Wornick's statement is not "reasonably capable" of sustaining the

4   meaning that Metabolife ascribes to it, and (2) even if the Court

5   could find the implication urged by Metabolife, Metabolife cannot

6   meet its burden of proving falsity under the anti-SLAPP statute.

7        Defendant Wornick's predictions regarding government

8   regulation of the sale of Metabolife 356 are not capable of

9   supporting the very specific factual implications regarding risk

10  of death that Metabolife attempts to ascribe to them.  On its

11  face, Wornick's statement does not address the particular health

12  risks associated with Metabolife 356.  At most, her statement

13  could be found to imply a general accusation that Metabolife 356

14  requires regulatory supervision to be safe enough for public

15  consumption.  The Court refuses to imply Metabolife's factual

16  assertions.  Moreover, even if the Court found that Wornick

17  conveyed the alleged implications, Metabolife could not meet its

18  prima facie burden of proving falsity under the anti-SLAPP statute

19  because, as the Court finds above, its scientific evidence of

20  safety is inadmissible under Daubert.

21

22      D.   Statements regarding the Vanderbilt Study.

23       Because Defendant Wornick's statements regarding the

24  Vanderbilt study are literally true, Metabolife relies on several

25  alleged implications from these statements as the basis for

26  _____

27  over-the-counter legal products.

28                                  -29-

1  liability.[19]  The Court holds that, even if Wornick's statements

2  create the alleged implications, Metabolife cannot establish a

3  prima facie case that the implications state false propositions of

4  fact.

5       In public concern cases, the Court grants full First

6  Amendment protection to all substantially true statements despite

7  minor inaccuracies.  See Masson v. New Yorker Magazine, Inc., 501

8  U.S. 496, 516-17 (1991); see also Maheu v. Hughes Tool Co., 569

9  F.2d 459, 465-66 (9th Cir. 1977) (finding that a statement is

10 protected if the "imputation is substantially true so as to

11 justify the 'gist' or 'sting' of the remark").  In other words, to

12 prove falsity, a plaintiff must show that the implication "would

13 have had a different effect on the mind of the [audience] from

14 that which the pleaded truth would have produced."  See Masson,

15 501 U.S. at 517.

16      Even assuming, arguendo, that Wornick's literally true

17 statements about the Vanderbilt Study support the alleged

18 defamatory implications, Metabolife cannot prove that those

19 defamatory implications are false.  The first proposition,

20 ────────────────────

21      [19]  Metabolife claims that Wornick's statements imply the
   following factual propositions: (1) Metabolife knows that the
22 product it makes and sells to the public is deadly; (2) There are
   no scientific studies concluding that Metabolife 356 is a safe
23 product, and no scientific support for the assertion that
   Metabolife 356 is a safe product; (3) Metabolife misrepresents to
24 the public that scientific studies have concluded that Metabolife
   356 is a safe product, and that there is scientific support for
25 the assertion that Metabolife 356 is a safe product; (4)
   Metabolife 356 has not been tested for safety; and (5) Metabolife
26 misrepresents to the public that Metabolife 356 has been tested
27 for safety.

28                              -30-

1  regarding the "deadly" nature of Metabolife 356, suffers the same

2  fate as the alleged implications derived from Dr. Blackburn's "you

3  can die" statement.  Metabolife has not offered any admissible

4  scientific evidence to establish the safety of its product.

5  The remaining propositions, which focus on the alleged

6  implication that no scientific studies support the safety of

7  Metabolife 356, are protected as substantially true.  At the time

8  of the broadcasts, the Chinese animal studies were the only

9  studies touting the safety of Metabolife 356.  For the reasons

10  that the Court discusses above,[20] those studies are so

11  insubstantial as to be essentially the same as "no studies" for

12  purposes of establishing the "gist" of Defendants' public concern

13  speech.  The Court considers it unlikely that, had Wornick noted

14  the existence of the Chinese animal studies, it "would have had a

15  different effect on the mind of the [audience]" than the alleged

16  implication that there were no studies at all.  See Masson, 501

17  U.S. at 517.  Short-term studies on mice and rats in Asia do not

18  bolster public confidence in product safety.  Accordingly, the

19  Court will not permit Metabolife to assert claims on the basis of

20  the alleged implications from the Vanderbilt Study statements.

21

22  E.  Statements about the "Credibility" of Metabolife.

23  Metabolife seeks to hold Defendants liable for Dr.

24  Blackburn's statement that the company lacks "credibility."  Like

25  Defendant Wornick's predictions regarding government regulation,

26  _____

27  [20]  See supra pp. 16-17.

28  -31-

1  this statement is non-actionable opinion.  Whether or not a

2  company is credible is not "provable as false," see Milkovich, 497

3  U.S. at 19, because credibility is not a concept capable of

4  definite and universal measurement.  Rather, statements regarding

5  credibility reflect the character and perspective of the speaker

6  and could trigger unresolvable, yet rational, disagreement among

7  speakers.  As such, Dr. Blackburn's statement resembles the

8  Supreme Court's example of non-actionable opinion in Milkovich:

9  "[t]he statement, 'In my opinion Mayor Jones shows his abysmal

10  ignorance by accepting the teachings of Marx and Lenin,' would not

11  be actionable."  Milkovich, 497 U.S. at 20.  Dr. Blackburn,

12  therefore, is entitled to the "breathing space" that "[f]reedoms

13  of expression require in order to survive."  See Hepps, 475 U.S.

14  at 772.  Accordingly, the Court strikes Metabolife's claims based

15  on Dr. Blackburn's "credibility" statement.[21]

16      Moreover, as with Defendant Wornick's statements regarding

17  the Vanderbilt Study, the Court refuses to permit liability based

18  on the defamatory implications alleged by Metabolife.[22]  As

19

20      [21]   In so ruling, the Court consciously applies the
   constitutional standard for non-actionable opinion in

21  circumstances for which the Supreme Court has explicitly "reserved
   judgment."  See Milkovich, 497 U.S. at 20 n.6 (reserving judgment

22  in cases involving non-media defendants).  The Court refuses to
   treat Dr. Blackburn differently than Defendants Wornick and WCVB

23  because (1) Dr. Blackburn and the two media Defendants published
   their statements in the same forum, and (2) the Court can discern

24  no reason why Dr. Blackburn is entitled to less "breathing space"
   for his expression than are members of the media.  See Hepps, 475

25  U.S. at 772.

26      [22]   Metabolife asserts the same defamatory implications on

27  the basis of Dr. Blackburn's "credibility" statement and Defendant

28

1  discussed above, Metabolife cannot prove falsity with respect to

2  those implications.[23]

3

4

5      F.   Statements noting that ephedrine is a main ingredient of
       both Metabolife 356 and methamphetamine.

6      The last category of statements for which Metabolife seeks

7  damages are Defendant Wornick's statements that ephedrine is the

8  main ingredient in both Metabolife 356 and the illegal drug

9  methamphetamine.   The Court grants Defendants' anti-SLAPP motions

10  and strikes all claims based on the statements themselves and any

11  alleged implications therefrom.

12     Defendant Wornick's statements are protected by the First

13  Amendment because they are substantially true.  All of the

14  statements and one of Metabolife's alleged implications[24] focus on

15  the similarity between the main ingredient in Metabolife 356, *ma*

16  *huang*, and pure ephedrine, a precursor chemical to

17  methamphetamine.   In order to prove falsity, Metabolife offers

18  expert testimony that ephedrine and *ma huang* are not identical.

19  (Farber Decl. ¶¶ 14, 15.)   Even Metabolife's own expert concludes

20  that "the effects of Ma Huang are similar to ephedrine," while

21  noting differences in potency and absorption rates between the

22  two.   (Id.)   Significantly, ingredient labels for Metabolife 356

23  ────────────────

24  Wornick's Vanderbilt Study statements.

25     [23]   See supra pp. 30-31.

26     [24]   This refers to the implication that "the main ingredient
   in Metabolife 356 is identical to the main ingredient in the
27  illegal drug methamphetamine."

28                                   -33-

1  and discount knock-offs of the product describe "Ma Huang

2  Concentrate" as "naturally-occurring ephedrine."  The fact that

3  Metabolife requires expert scientific opinion to describe the

4  limited differences between *ma huang* and ephedrine convinces the

5  Court that such fine distinctions would have had no effect on the

6  state of minds of the audience had they been raised by Defendant

7  Wornick.  Accordingly, Wornick's statements are substantially true

8  and protected by the First Amendment.

9      Metabolife also asserts claims on the basis of two additional

10 implications derived from Wornick's statements: (1) the main

11 ingredient of Metabolife 356 is an illegal controlled substance,

12 and (2) Metabolife intentionally and deceitfully passes off as a

13 dietary supplement a product that is essentially no different than

14 the illegal drug methamphetamine.  The Court holds that these

15 statements are not "reasonably capable" of being implied from

16 Defendant Wornick's statements.[25]  Defendant Wornick's statements

17 do not concern the regulatory status of *ma huang* or make a direct

18 comparison between Metabolife 356 and methamphetamine.  Rather,

19 the statements consistently compare the primary ingredient of

20 Metabolife 356 to the primary ingredient of methamphetamine.  Only

21 by misconstruing Defendant Wornick's carefully chosen words could

22 a listener come away with the impression that *ma huang* itself is

23 an illegal narcotic or that Metabolife 356 is identical to

24

25

26  _____

27      [25] See Court's discussion, *supra*, pp. 25-26.

28                              -34-

1   methamphetamine.[26]   Consequently, the Court strikes Metabolife's

2   claims based on those alleged implications.

3

4   **IV.   Conclusion**

5          For the reasons stated above, the Court grants Defendants'

6   anti-SLAPP motions to strike as to each of Metabolife's claims.

7   Accordingly, the Court dismisses the complaint with prejudice.

8

9   IT IS SO ORDERED:

10  Date: 11\16\99                        _John S Rhoades_

11                                        John S. Rhoades, Sr.
                                          United States District Judge

12

13

14  Copies to:

15  All Parties
    Magistrate Judge

16

17

18

19

20

21

22

23

24

25  ─────────────────────

26       [26]   For a discussion of how such misconceptions can be
    provoked, see the Court's evaluation of Metabolife's Marylander

27  Study, supra note 17.

28                              -35-